Good morning, Your Honors. My name is Patrick McAnders, a law firm Spencer Fain, and I represent the appellants. Now may I please the court. This is an appeal from an extraordinary, drastic, and rushed preliminary injunction that should have never been entered. The injunction restrains my client, a Missouri nonprofit organization called the Charles N. Sharpe Jr. Foundation, from possession of roughly 5,000 acres of valuable farmland it owns in Knox and Lewis Counties, Missouri. Now to maintain consistencies with the briefing, I'll refer to my clients, the appellants, as the Ministry. Now the District Court abused its discretion when it entered a preliminary injunction as it misapplied the law and relied on clearly erroneous factual findings. Now first, the District Court abused its discretion by granting a preliminary injunction without providing sufficient notice to the Ministry. Rule 65A1 states... That brings me to a question, sort of basic. Where is the preliminary injunction that was issued? The TRO order, the order granting the TRO quite clearly contemplates the possibility of a later preliminary injunction being issued. That's a really good question. A related question is, I think, maybe the parties have conceded this point, but it bothers me that this Rule 65B2 talks about TROs that are issued without notice. This is not such a TRO. But anyway, the first part of my question you were about to answer, please do. Yes, as to your first question, although the document is titled Temporary Restraining Order, the last page, in fact, grants the objunction and there is no time limitations. This has all the hallmarks of a preliminary injunction, and we know from the Supreme Court's decision in Sampson v. Murray, made clear that a Temporary Restraining Order that is not limited in time is treated as a preliminary injunction. And, in fact, LaBelle, in its briefing, admits that the March 25th order is a preliminary injunction. That's on the page 1. It's a jurisdictional statement. Couldn't you have sought an additional hearing in the District Court, certainly after the 14 days where any TRO, I think, by rule would have lapsed? I think there's some indication on the record, maybe, that there was an inquiry from LaBelle to counsel for the ministry about, are you going to seek a hearing or challenge the preliminary injunction? And my recollection is there wasn't a response. Does that matter, or? The Bell had already been wrong. The court had already entered its preliminary injunction. And, actually, the fact that... Okay, so could you have moved for reconsideration at that point and said, we want a hearing because we were caught off guard? There is no a-circuit present that you have to file a motion for reconsideration when the preliminary injunction has already been entered. But when your complaint is either or both, I didn't get notice, nor did I get a hearing, and you're still in front of the District Court, and now you have notice, not the way you wanted it, and you still have the opportunity for a hearing, why aren't you obligated to seek that? Especially given the fact that it was rushed, as you described, and that it was a motion for both a TRO and a preliminary injunction. Again, the Bell had already been wrong. And the fact that the plaintiff is reaching out saying, would you like to request a hearing on our motion for a temporary restraining order? On a preliminary injunction. I'm sorry, a preliminary injunction. Admits that they knew that was already a preliminary injunction. The courts, in its order, did not invite the parties to contact it. Well, after 14 days, it was a preliminary injunction, right? And you were still active in the District Court. In your honor, it didn't say 14 days. In fact, it was not time... Wasn't there a rule that a TRO ends in 14 days? There is a rule, yes, and the court has to issue another finding of why it's appropriate to extend that TRO. It didn't do that. Here, the court just said, I'm issuing my order, and it's for an indefinite period of time. It didn't actually put a time limit, nor did it invite the parties to contact it for a hearing. Nor did it say an additional hearing would be held on a preliminary injunction. If we do agree with you that there was a due process violation, would we vacate the preliminary injunction and order a hearing? Yes. On the preliminary injunction? Yes, we are entitled to that evidentiary hearing. It's important to remember that the District Court deprived itself to get the issue right, because it only relied, and it only had declarations from the attorneys. The only evidence that was in the record at that time was from a declaration from LaBelle's holding company's general counsel, and my friend here, Mr. Pitts. Those were the only two declarations that was in the record. I'm not sure this is relevant or not, but I guess I'll ask it anyway. What is the status of the litigation in the District Court at this point? We're in the middle of discovery right now. It continued on. I'll let you move on in a minute, but you've said the bell had already been rung, and you've said that a couple of times. Tell me what you mean by that. What's the bell, and what was the ringing? The court had already issued the preliminary injunction on March 25th. It didn't invite the parties for an additional hearing. And that's the TRO? I'm sorry, yes. Well, the TRO, but we know from Samson v. Murray in the Supreme Court, it's actually a preliminary injunction. The court had already made its decision. But it made a decision on the TRO. Well, it issued what was in effect a preliminary injunction, because, again, the Supreme Court has taught us in Samson v. Murray that when a temporary restraining order is not limited in time, it should be treated as a preliminary injunction. But the legal analysis that drove that was the likelihood of success and the merits, right? Which, as I take it, your argument would be, well, wait, if we have a chance to actually introduce evidence, that will change the District Court's calculation on the likelihood of success. Is that fair? That's very fair, Your Honor. And, in fact, that gets to the second point, that the District Court erred in finding that LaBelle is likely to succeed on the breach of its lease claims. Now, LaBelle claims the Ministry breached the lease in two different ways. By, one, not selling LaBelle approximately 6,100 acres of farmland, based on what isn't an unenforceable, illusory, and vague one paragraph in the lease, which LaBelle claims is a binding purchase agreement to sell thousands and millions of dollars worth of farmland. Now, number two, LaBelle claims that the Ministry did not engage an appraiser to determine new market rate rent for the renewal term. Now, as to that first breach, that Article 1 of the lease states that not later than October 1, 2020, the parties were, and to I quote, enter into a separate agreement that will provide terms upon which LaBelle shall purchase land from the Ministry. The land to be sold? Well, Article 6 isn't really clear. It says that it is the leased premises, and the leased premises is vaguely defined in the agreement as approximately 6,100 acres of tillable farmland. Article 6 also says not only will the Ministry sell LaBelle the leased premises, but, and I quote, all additional acreage surrounding the leased premises. The lease, under Article 6, provided legal description of the leased premises, no tax parcel number, not even addresses. Weren't the parties acting and conducting their businesses under this lease understanding what the leased premises were? Actually, no, Your Honor. It's important to remember that the Ministry owns about 11,000 acres, and within that is this 6,100 acres. Mr. Sharp, who is the benefactor of this foundation, he was a successful business student from Missouri and came back to Lewis and Knox County and essentially bought a lot of his family members' farms and amassed almost at one time 18,000 acres of farmland. These were all handshake deals. There was never title work done. There was no clear understanding of what fat acres that were on, and in fact- There's not evidence that there was, though, such an understanding that everybody knew what it was. At this stage, all that has to be shown is the fair likelihood of success, right? Well, everybody- I don't even have to show you one summary judgment. I mean, what's at stake here is that there is evidence that everybody knew what the big farm picture looked like. Isn't that correct? That was not on the record. Again, the only declarations offered by LaBelle in support of its injunctive release was the declarations from LaBelle's holding company, Milk Source, in Wisconsin, their general counsel. There is not one declaration from anybody from LaBelle that was offered with their motion. There was no operations manager, no employee, nothing. So, it actually was not clear, and had the district court had an evidentiary hearing, they would have heard from the actual people running the dairy that, yeah, there wasn't an exact understanding of what the lease premises was and then what the surrounding premises is. You have to remember that the lease premises only includes the tillable acre of a land. And I'm sure your honors have all been through the great state of Missouri here. Our land is not perfectly square. The tillable land is like a hand within that, right? It kind of goes in and out. It was a very loose understanding. The parties essentially, and if the district court would have heard evidence, that Article VI was essentially a kicking the can down the road. The parties couldn't agree at the time they entered it what land- LaBelle didn't know what land they wanted and they didn't want to enjoy- or they didn't want to bind themselves to having to buy millions of dollars of land that they might not need. The ministry also at that time wasn't sure. And had this evidence been heard, which is alluded to, your honors, in the current record at the joint appendix at 260, there's email changes about that this was essentially an agreement to agree. We've all agreed, we didn't know what we wanted to buy, and so we're just going to kick the can down the road and do basically a memo of understanding. I understood it was sort of a rolling obligation, so it wasn't necessarily we don't know what land, but which parcels we want to buy in year two, year three, year four, which is actually a different identification problem. Correct. There's multiple problems, not only- Well, I guess what I'm saying is I'm not sure if everybody knows the general land that we're talking about because SHARP was the one, they had been operating this as well, right? So they knew what was tillable and what was the surrounding, the dairy, right? Well, they owned at the time that they sold it 18,000 acres. But they were only giving- Hadn't they been operating the dairy? They had, right. But again, this lease land was for farming and forage for the cows. So actually when they were running it, they were foraging about several thousand more acres of their land to feed the dairy when they operated it. So again, this wasn't an apples to apples sale, right? It was within this larger swath of land that they gave them certain rights. And it was a loose deal on what was to be sold and agreed to. Let me ask you, I mean, what effect will what we have, our decision in this case, have on the actual dispute between the parties? I mean, I understand that there's a PI out there, but you've also indicated that the validity of the lease is being actively litigated in the district court. There was a representation by the ministry at some point that it would not seek self-help. I don't know that it's bound by that anymore. But certainly, title to the premises, however defined, is clouded at this point. I mean, what are we really sitting here and arguing about as far as what changes going forward in real life for the parties? So right now the plaintiff is essentially using that decision that with the one paragraph article six was a purchase agreement to sell 6,000 acres and that they're claiming that is the law of the case. And the district court made that decision on a very rushed basis and on a very limited record. But it will reconsider that basis before entering final judgment, correct? It could, Your Honor, yes. Well, it will have to, right? It will. In order to enter final judgment, there was a fair probability analysis that was preliminary. So what is this much ado about nothing practically speaking? I understand that your client is under a preliminary injunction at this point. But to what end are we working on this? Because it seems to me practically your client can't sell the property to another party until this case is resolved. That's correct. Right now, if they don't pay their rent on May 1st, we can't do anything. But they are paying the rent, right? Right now. At a higher rate than they say you're entitled to. Right, right. That could very well change. And, Your Honor, I do think some direction on interpretation of Article VI would be helpful for this report. But we would be interpreting the fair likelihood of success, whereas the district court and the merits would be determining it as a matter of final judgment. It would be a different standard. That's why I'm like, why are we, what are we doing here? Due process. We did not get due process in our rights. So if there's no further questions, I'm going to reserve my time for rebuttal. Thank you. You may. Thank you. May it please the court. My name is Ian Pitts, and along with my colleague, Jeff Schultz, we represent LaBelle Dairy, LLC, the plaintiff of L.E. The district court properly prohibited defendants from evicting LaBelle in order to preserve the status quo and protect the court's ability to award meaningful relief after trial. The premises are essential to support a 5,000 head dairy operation on adjoining land. Defendants seek to evict LaBelle despite the fact that it has paid rent faithfully throughout the term of the lease and been a good steward of the land with a record of environmental compliance. Judge Autry's order was proper both procedurally and substantively. Procedurally, the defendants had every opportunity to be heard on LaBelle's injunction motion, but they declined to pursue that opportunity. I think it's important to look at the chain of events and what actually happened here. LaBelle moved for both a temporary restraining order and a preliminary injunction simultaneously. The district court scheduled a hearing on the temporary restraining order. Defendants chose not to present live testimony. They contested the TRO with declarations, lengthy declarations, and arguments of counsel. This was their right, and it was a reasonable decision under the circumstances because there really are not many facts in dispute, probably no material facts in dispute. The district court then issued an order which granted the temporary restraining order. That order, as Your Honor noted, explicitly did not decide the injunction motion, and it clearly contemplated an injunction hearing. As I read the order, it invited the defendants to schedule an injunction hearing. Well, in fact, the motion from TRO had attached to it a kind of form in which the court could have filled the dates in for a PI, a preliminary injunction hearing. Did it not? I believe it did, Your Honor. The court did not do that. The court wrote its own order, and Mr. McAndrews says, characterizes the last page of that order as granting the preliminary injunction. That's not a fair representation of the court's order. The joint appendix, page 374, says, it is hereby ordered that plaintiff's motion for a temporary restraining order is granted. It is further ordered that pending this court's issuance of a ruling with respect to plaintiff's request for a preliminary injunction, defendants are enjoined and restrained from taking any action to evict or otherwise interfere with LaBelle's possession of the premises. That's what the court actually wrote, and there is no way to characterize that as granting a preliminary injunction. That's the page that Mr. McAndrews referred to. What that page actually did was show that the court intended to grant the TRO and contemplated a subsequent decision on the injunction motion. After the district court entered that order, the record at R42-1 reflects that I repeatedly, more than once, reached out to defendants' counsel by phone and in writing to ask if he wanted to call the clerk and schedule an injunction hearing. Mr. McAndrews ghosted me, did not respond. Instead, they filed this appeal. You're saying that's a waiver? I'm absolutely saying that's a waiver, Your Honor, and I think it goes beyond that. It shows that defendants didn't request a hearing because they didn't want a hearing. What they wanted to do was come directly to this court and try to get a different opinion than Judge Autry had already rendered on the legal issues in the case. The law does not permit this. Under Northern Bottling Company and Platte Valley Bank, they were obligated to raise an assignment of error with the district court first. I think defendants' reply brief on this point is absolutely telling. Page 6 of the reply brief kind of says the quiet part out loud because there Mr. McAndrews is responding to our argument that, hey, I asked you to schedule an injunction hearing and you wouldn't do it. He said they didn't want an injunction hearing before the district court because, quote, the district court had already made up its mind, end quote. That's what they say. That's a deliberate decision not to have an injunction hearing, and they may have been right about their strategic assessment of their likelihood of success at a preliminary injunction hearing because they'd taken their best shot at the TRO. They filed 33 pages of briefs. They filed tons of declarations and exhibits, and there was no factual record that they could develop at an injunction hearing that would change Judge Autry's mind. There was this declaration by Duquesne, is that his name? Yeah, that was our declaration. Yes, which was filed fairly late, was it not? Mr. Duquesne filed two declarations. The first declaration was in conjunction with the motion. Then he filed a rebuttal declaration the day of the hearing, which rebutted what they had said. So, anyway, at least part of his testimony is what I think Sharp wants to have a crack at, and at least part of that testimony got introduced very late, so I wonder if there's really some kind of notice difficulty here. I don't think so, Your Honor. It doesn't go to your waiver point. Yeah, I mean, I guess from my perspective, we got their responsive brief the Friday before a Monday hearing, so we filed the rebuttal declarations at the first opportunity. I understand. I didn't say what you wanted. I'm not saying you were sandbagging them. I'm just saying it's a matter of the clock running. Right. I mean, I'm a lawyer. Suddenly this stuff comes in the morning of the hearing. Are you kidding? I mean, it's just – And I suppose if Mr. McAndrews had showed up at the hearing and asked, can we supplement the record with something contradicting what Mr. Duquesne had said, he might have a point, but he didn't. He showed up at the hearing and argued based on his own declarations, and then he deliberately decided not to work with me to schedule an injunction hearing, at which point he could have negated what Mr. Duquesne had to say. They didn't do any of that, and just because he knew he was going to lose the injunction hearing doesn't mean he didn't have an opportunity for the injunction hearing. And the killer for me gets to what Judge Coates was asking. What's the relief if they win on this procedural point? It's a remand for a hearing, the same hearing they say they don't want because they think the district court's mind is already made up. Why remand for the sake of a hearing that they've already made an intentional, voluntary relinquishment of their right to have? Let me ask you, what is the actual effect right now of the TRO or the preliminary injunction? I'll just call it a preliminary injunction for the purposes of this argument. I mean, the case is being litigated. I guess my question goes to what was the irreparable harm here? I've got some concerns about that. I understand that land is different, but if you could highlight what is the irreparable harm with an eye toward why it matters. Sure. The irreparable harm, first of all, is established by operation of law. Under O'Hagan, the Eighth Circuit has said that a deprivation of an interest in land cannot be repaired by monetary damages. But what's your deprivation of an interest in land? I mean, there was an indication early on that they're not going to seek self-help. What they would do is seek judicial eviction. Now, that is not a deprivation of land. It could result in one, but it's not irreparable harm now. It is irreparable harm because they could seek that injunction. Could. You just said could. I mean, they might not. But if they do, and if they do it in state court, then all of a sudden you've got a constitutional issue and a concern about the court's rendering inconsistent determinations. You could file an opposition in state court and file a Liz Pendon's cloud title and ask the district court to stay that pending resolution of the federal case, right? In other words, there's a lot of ifs there before you get to deprivation of private property. But at that point, the federal court's hands are tied. The court that has the case before it, it has a constitutional concern about interfering in what the state court does. So it can't enjoin defendants at that point. And the state court, we don't know what they're going to do. Again, we don't know what they're going to do.  And you admit you could file a Liz Pendon's, right? You could oppose the sale. You could seek an order in state court preventing the sale of the property. We did file a Liz Pendon's. It sounds like you just don't want to have a fight in state court. We don't want to have a fight in state court. I don't blame you. Particularly when we have at stake the loss of all of this adjoining property, which is going to undermine the dairy. The potential loss. What do you mean the intentional loss? Well, potential loss. Potential loss, yes. I just don't see anything irreparable about where this case was at when the TRO issued. And I understand the district court may have been anticipating further action and just said, look, I'm going to enter the TRO because I'm concerned about this. But the risk of inconsistent determinations between the state and federal court on these issues is in and of itself irreparable harm. The mere specter of that happening is a sufficient basis upon which an injunction can be granted. And I believe we cited authority to that proposition in our memorandum in support of the TRO, which is in the record. That, particularly when it's combined with the specter of us losing land that is necessary for our nutrient management plan, necessary for the support of our herd, all of that well supports the district court's exercise of its discretion to award a preliminary injunction. No, the district court didn't go into any sort of constitutional issues or concerns about inconsistent verdicts, did it, in its order, granting the TRO? Not in its order, but it was discussed during the hearing. And the transcript of the hearing is in the record. We talk about the Bower decision, which Judge Autry, in fact, had authored, which raised the specter of this constitutional crisis. So that was very much before the court. So I'd like to transition briefly to the substantive grounds upon which the decision, I think, is unassailable. And most of this is addressed in our briefs, but Mr. McAndrews focused his argument on likelihood of success on the merits on the clarity of the property description. And so I want to respond to that. Under Missouri law, land need not be fully described or identified from a mere reading of the paper. It has to be capable of a survey. Here, though, it is fully described. It's described as the least premises plus all additional acreage within the existing parcel or tax parcel legal descriptions. The least premises are clearly defined in Exhibit 1.01. There are maps. There are fields described by name. Everybody knows what the name of that field is. And the maps actually contain also the township range and section numbers. So we know where the field is. Then we've got to determine what the tax parcel is that these fields are within. That can be done simply from a plat map. We know now exactly what tax parcel we are talking about. Those tax parcels have defined boundaries. Using the tax parcel number, you can find deeds from prior sales of the same parcels of property, and those deeds will have legal descriptions in them. So that's what the First Amendment to the lease meant when it talked about the existing legal descriptions, was the ones in the deed for the purchase of the same parcel of property that they are now obligated to sell to us. I would also point out that each and every one of these parcels of property has been transferred from Sharp Holdings, Inc. to the Foundation. In order to do that, they had to have surveys. They had to have legal descriptions drawn up. They had to know exactly what property is subject to the purchase right. Has that been subject to discovery in the district court case? Absolutely. And that's in process, I take it? Yeah, I would characterize it more as being at the end of discovery. We've done the vast majority of it, and we are prepared to present this case to trial at this point. I have a question about the lease. What notice of any of an alleged breach of Article II did you give? Of Article II, there's just a fairly vague reference in one of Mr. Duquesne's letters to the effect that they are ignoring their contractual obligations. I noticed that the district court didn't deal with that question at all. It just dealt with Article VI. Is that a difficulty or not? I don't think so, Your Honor, because really we don't have to prevail on our argument that they violated the lease in order to justify this equitable relief. What we have to prevail on is our right to our continued possession of the premises. And so we've got to essentially show a likelihood of success on their counterclaim for eviction. And that we have done in spades. I know the business about how the claim is that you agreed to a rent provision that you say you did not agree to, and there's plenty of evidence. Clearly did not agree to that, Your Honor. And I would also add that the amendment that they want to say we should have signed, that's not just the rental term or the amount of rent. It includes a release of sharp holdings. It includes all sorts of things that the parties never negotiated for. Thank you all. Thank you. Thank you, Your Honors. I want to start with the last verse in where my friend here said that the ministry transferred all the land from the foundation and had all these surveys done. That was well after the parties entered the lease. When you look at the time they entered the lease, there were no legal descriptions. There weren't. And we knew that. They knew that. We knew that. That's when we were working trying to get that done. Now, the second point is to the waiver issue. That issue was fully addressed in Synergy v. Andrews, which is briefed on 29 of our brief by the Third Circuit. The fact that the ministry didn't ask for a hearing on their motion after the court, clearly in the order did not say anything about a further hearing. There is no mention in that March 25th order that the parties were going to get another hearing. Second, I do want to draw the court's attention to the judicial appendix at 207, which is the court's order on the setting of the hearing. They just sent a hearing on the motion for the TRO, nothing about the preliminary injunction. Thank you, Your Honors. Thank you. Thank you. May I make a comment?  Since the time is running, I notice that there is a suggestion in here, perhaps in both the briefs, but that somehow the federal courts are supposed to defer to district judges' appreciation and evaluation. State court law, when state court law is relevant to federal court adjudication, that presumption is long gone. There was a case called Salve Regina against somebody or other, which the Supreme Court decided in 1991, which got rid of that presumption. So in case this comes up, this is an advisory opinion. You might want to look at this case. Okay. Thank you, Your Honor. The reason I know that is I was a district judge when that case came down, and I thought it was very wrong. I've committed it to memory. Thank you. Thank you, Your Honor. Thank you, Counselor, for your argument. We'll take the matter under advisement and appreciate Judge Arnold's advisory opinion in advance. The court will be in recess for about ten minutes.